IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CLARENCE L. HICKEY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CV3111 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | MEMORANDUM AND ORDER |
| Michael J. Astrue, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court for resolution of Clarence L. Hickey's appeal of a final determination of the Commissioner of the Social Security Administration denying his application for under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.* and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* This court has jurisdiction under 42 U.S.C. § 405(g).

## BACKGROUND

On September 10, 2002, plaintiff Clarence L. Hickey filed an application for disability benefits, alleging that he suffered from a disability beginning on July 28, 2002. Filing No. 8, Social Security Transcript ("TR") at 96-99. Hickey's application was denied initially and upon reconsideration. TR 42-45; 47-51; 52-55; 57-61. Following a July 13, 2004, hearing, an administrative law judge ("ALJ") denied benefits. TR 15-31.

Clarence Hickey was born on March 18, 1942. TR 19. He has an eighth grade education and has previous relevant work experience as an unskilled laborer. TR 19, 110, 352. Hickey claims disability as the result of injuries to his lumbar spine and shoulder from a rollover automobile accident on July 28, 2002. TR 101, 208. Hickey received treatment

in the Nemaha County Hospital emergency room for his injuries. TR 208. The attending physician prescribed anti-inflammatories and instructed Hickey to rest and apply ice to sore areas. TR 208. Two days later, on July 30, 2002, Hickey saw Dr. Dana Farris at Auburn Family Health Center, complaining of left shoulder and back pain. TR 221. Dr. Farris noted lumbar muscle spasm and pain and tenderness of the left shoulder and prescribed Bextra. TR 221.

Hickey again saw Dr. Farris on August 6, 2002, complaining of persistent back pain. TR 221. Dr. Farris noted that Hickey had mild discomfort around the anterior joint line, and that his lower back revealed lumbar tightness, discomfort, and decreased flexibility. TR 221. Dr. Farris further noted that Hickey's straight leg raising was restricted because of tightness in his hamstring. TR 221. Dr. Farris prescribed Bextra, Soma, and stretching exercises and rest. TR 220. Dr. Farris also offered physical therapy, but Hickey declined. TR 220.

Hickey returned to Auburn Family Health Center on August 12, 2002, stating that the Soma made him "groggy and woozy." TR 220. He also stated that he suffered continued back pain but did not suffer radiculopathy. Dr. Farris noted that Hickey was moving stiffly with persistent lower lumbar spasm and pain with palpation. TR 220. Hickey agreed to physical therapy but declined further muscle relaxants. TR 220. He continued with the Bextra prescription. TR 220.

On August 19, 2002, Hickey saw Dr. Farris again and stated that he suffered continued back pain that had not improved over the past two weeks. TR 220. Hickey also complained that he did not respond to the physical therapy, and he reported intermittent radiculopathy down alternating legs. TR 220. Dr. Farris noted Hickey's physical therapist

2

was concerned in light of Hickey's lack of progress. TR 220. His straight leg raising was restricted to 45 degrees and appeared to be positive. TR 219. Dr. Farris continued Hickey's medications, ordered a CT scan of Hickey's lumber spine, and referred Hickey to Dr. Bruce Miller for orthopedic consultation. TR 219.

On August 21, 2002, a CT of the Lumbosacral spine was performed on Hickey. The scan showed that Hickey suffered broad degenerative protrusion of the disc space at all levels of L3 to S1, the most prominent of which were at L4-5. TR 215. The CT scan also showed that Hickey had arthritis and hypertrophy in his lumbar spine. TR 215.

Hickey saw Dr. Miller on numerous occasions from August 23, 2002, to December 11, 2002. TR 227-29. On August 23, 2002, Dr. Miller noted that Hickey had "marked limited motion in his lumbar spine with paralumbar muscle spasm and mid lumbar tenderness." TR 240. He also noted that Hickey could bend forward about 20 degrees, and his lateral bending, extension, and rotation were also restricted. TR 240. Dr. Miller started Hickey on daily hot moist packs and a stretching exercise program to improve Hickey's range of motion. He also stated that Hickey would "not be able to work until he gets over this as he does heavy work requiring lifting heavy bags of dog food and so forth." TR 241.

Hickey returned to Dr. Miller on August 30, 2002, after getting better according to his therapist's report but then having a setback the day before. TR 239. Dr. Miller prescribed Skelaxin, as the Norflex was not effective, and also stated that Hickey would continue physical therapy. TR 239. Finally, Dr. Miller stated that he did not think Hickey could go back to work yet, but that he should, considering his income was "zilch," and that "perhaps he would be a candidate for social security disability." TR 239.

On September 13, 2002, Hickey saw Dr. Miller for continued severe back pain and limited motion and spasm. TR 238. Dr. Miller noted that there was some improvement in Hickey's motion, but that was "about all." TR 238. Hickey also experienced some paresthesias in both feet and experienced radiating pain into the right thigh laterally. Straight leg raising was positive. TR 238. Dr. Miller recommended a dye enhanced MRI and expressed concern that Hickey was not responding to treatment if it was only a simple sprain. TR 238. Dr. Miller also continued physical therapy. TR 238.

On September 15, 2002, an MRI revealed mild, broad annular bulging at L5-S1 and minimal posterior annular bulging at L4-5, as well as an L2 compression fracture of about 10%. TR 237, 244, 248. Hickey saw Dr. Keith W. Lawson in consultation on September 20, 2002. Dr. Lawson reported that Hickey's condition was unchanged, and that he had point tenderness over L1 and L2. TR 237. Hickey's straight leg raising was negative. Dr. Lawson continued Hickey's strengthening exercises and ordered Hickey to have a back brace fitted. TR 237.

On September 27, 2002, Hickey saw Dr. Miller again for continued back pain. TR 236. Dr. Miller noted that there had been no improvement at all in Hickey's symptoms. Dr. Miller ordered a bone scan and continued use of the back brace. TR 236. Dr. Miller's report of October 11, 2002, provided that the L2 compression fracture was consistent with what he saw earlier, and that there was probably delayed healing because Hickey was a smoker. TR 235. Dr. Miller recognized that Hickey lost his job at the "dog food place," but stated that Hickey could probably do some "light work." TR 235.

On November 8, 2002, Dr. Miller noted that Hickey's x-rays revealed a "definite collapse now of the superior end plate of L2 and what looks like . . . a circumferential lesion." TR 234. Dr. Miller discussed Hickey's condition with Dr. David L. Kiple (MD/Radiologist) regarding Hickey's lack of progress, but Dr. Kiple stated that as an unhealed compression fracture, he was "not surprised that it continue[d] to bother [Hickey] at this length." TR 231.

Hickey underwent an L2 vertebroplasty at Saint Elizabeth Community Health Center on December 16, 2002. TR 242. Hickey tolerated the procedure well and experienced less pain immediately after the procedure and ambulated home "essentially pain free" two hours later. TR 242, 243.

Hickey returned to Dr. Farris nearly two months later complaining of continued disabling back pain despite multiple attempts at physical therapy, various anti-inflammatories, and injections. TR 285. Dr. Farris observed Hickey to walk slightly stooped and noted that Hickey appeared uncomfortable. Dr. Farris ordered another bone scan and stated that Hickey declined any anti-inflammatories, pain medications, or muscle relaxants. TR 285. The bone scan of March 3, 2003, revealed "mild increased uptake in the L2 vertebral body similar to the prior examination consistent with previously noted compression fracture" and a "minimal increased uptake in the left 9th posterior rib which is stable." TR 281. There was also "new minimal uptake seen within the lower anterior costochondral junction." TR 281.

Hickey saw Dr. Farris again on March 4, 2003, complaining of continued disabling back pain. TR 285. Hickey declined anti-inflammatory medications, and had not yet

responded to physical therapy and conservative measures. TR 285. Dr. Farris noted that Hickey moved stiffly and his straight leg raising was negative. Dr. Farris stated that Hickey was "trainable and could work at a more sedentary job and should avoid heavy lifting." TR 284.

Upon referral, Hickey received treatment from Dr. Essay at the Pain Clinic in Lincoln, Nebraska, from March 10, 2003, to September 2, 2003. In the consultation report, Dr. Essay noted that Hickey was taking Skelaxin but refused additional medication from Dr. Farris and that Hickey described his average pain as 8-9/10. TR 313. Hickey's back was "diffusely tender with most of his discomfort coming from palpation in the midline over the spinous processes from L1 through L5." TR 314. Hickey further experienced severe discomfort with flexion of the spine, only able to flex at 50%. TR 314. Dr. Essay stated that there were two separate problems, that most of Hickey's back pain came from his previous vertebral body compression fracture, and that most of the pain in Hickey's legs was not in an L2 or L3 distribution; rather, it was more on an L4-L5 distribution. Dr. Essay discussed three options of treatment with Hickey, including not doing anything, trying anti-inflammatories, and injection therapy. TR 314. Hickey chose to start on Vioxx 25 mg per day. TR 314.

Hickey subsequently received an interlaminar epidural steroid injection, and Dr. Essay "also injected trigger points specifically the ligaments of the low back." TR 309. These treatments provided Hickey with some relief and Hickey felt a moderate amount of improvement, although Hickey still experienced pain. TR 309. Dr. Essay ordered that Hickey continue taking Tylenol No. 3 and prescribed Naprosyn 500 mg. TR 309. On

6

September 2, 2003, Dr. Essay wrote a letter to Dr. Farris stating that no further treatment was indicated. TR 297. Dr. Essay also stated that he encouraged Hickey to continue wearing his back brace and told Hickey that "undoubtedly he will continue to have some discomfort from this problem, perhaps for many months to come." TR 297.

Further treatment by Dr. Farris indicated continued back pain. Dr. Farris noted that Hickey was not taking the Vioxx as before but he used some Tylenol with Codeine occasionally. TR 284. Dr. Farris also noted that Hickey was "really not a pill taker." TR 284. Dr. Farris noted on September 5, 2003, that Hickey was having a lot of knee and hip pain in addition to Hickey's chronic back pain, as well as fatigue. TR 296. On October 6, 2003, Dr. Farris noted that Hickey did not seem as though he was pursuing his therapy and stretching. TR 294. Dr. Farris switched Hickey back to Naprosyn 500 since Hickey felt that provided him more relief. TR 294.

On October 30, 2002, Non-examining Disability Determination Services (DDS) physician Dr. Knosp provided the first of four residual functional capacity (RFC) assessments. Dr. Knosp noted that Hickey was limited to 50 pounds lifting occasionally, 25 pounds frequently, stand, walk and sit about six hours in an eight-hour workday. TR 195. The non-examining physician indicated "Claimant's allegations are credible at this time but his nondisplaced compression fracture of the 2nd lumbar vertebra should heal within several months time and by July of 2003 he should be able to return to his previous work activity." Tr. 202. On January 29, 2003, the October 20, 2002 RFC was reviewed by another DDS non-examining physician, Dr. Chael, who confirmed Dr. Knosp's determinations based on a review of Hickey's medical records. TR 206.

On July 10, 2003, a third RFC report indicates that Hickey was limited to 50 pounds lifting occasionally, 25 pounds lifting frequently, stand, walk, and sit about six hours in an eight-hour workday. TR 259. Further, in the July 10, 2003 RFC, the DDS physician disputes the treating physician's use of the terms "sedentary job and should avoid heavy lifting." In the DDS physician's opinion, "The use of sedentary terminology is reserved to the commissioner [of social security]." TR 264. On August 29, 2003, Dr. Knosp confirmed the July 10, 2003, assessment. TR 267.

<u>Third-Party Evidence</u>

Lisa Kohout, an intake employee of the Social Security Administration, completed Hickey's Disability Report - Field Office Form SSA-3367. In the report dated September 9, 2002, Kohout observed that Hickey "walked slowly and cautiously," that "he used the desk or arms of a chair to help him stand up," that he wore "very dirty clothes and smelled unclean," and that he "seemed low functioning educationally but appeared capable." TR 98. On the report of May 27, 2003, Kohout noted that Hickey "walked with a limp," that it "took him a while to get up out of the chair," and that Hickey's "clothes were very dirty and smelled unclean." TR 130.

On May 30, 2003, Ruth Reuter, Hickey's friend, completed a Supplemental Information Form. TR 140- 142. Ms. Reuter reported that Hickey visited friends daily, continued to fish and hunt and took care of his children and pets. TR 140-141. She also noted that he owned and ran his own salvage yard. TR 140. She stated that Hickey spent every day at the salvage yard where he would take pieces from cars and put up sheets of tin. TR 140, 142. Ms. Reuter stated that Hickey drove around during the day picking up junk out of ditches. TR 140. Hickey also sometimes worked for Ed Findley at the recycling

center outside of Humboldt.  TR 142.  She stated that Hickey needed to bathe more often.  TR 141.

### Hickey's Testimony at the ALJ Hearing

At the July 13, 2004, ALJ hearing, Hickey testified that he "just can't bend down and lift" or stay on his feet.  TR 339.  He stated that he was having problems with his back, and possibly diabetes, but that he was not taking medication because he could not afford it.  TR 340.  Hickey stated that he takes aspirin as well as hot baths two to three times a day.  TR 340.  Hickey stated that he did not think he could walk over three blocks, stand over fifteen minutes, and sit about thirty minutes in a chair so long as he shifted during that period.  TR 341.  He stated that he lays down, usually on his bed, for up to a few hours each day.  TR 342.  Hickey lives by himself and cooks "easy to fix" food for himself.  Hickey testified that he did not think he could do a job that required him to stand or walk six out of eight hours.  Hickey further stated that he could not perform any of the past jobs he had done.  TR 341.  Hickey claims to have pain in his lower and middle back, and his middle shoulder area.  TR 341.  Hickey stated that there were times that he'd bend down or step off a step, and the pain would be so intense that as a result he fell down.  With regard to Hickey's sleep, Hickey stated that he is "up and down once a night" due to the pain.  TR 345.

The ALJ questioned Hickey regarding doctor reports that he was not pursuing his therapy and stretching exercises.  Hickey stated that they were not true and that he had a rubber ball that he used for exercise.  TR 346.  He testified that the doctor's report regarding his lack of therapy and stretching was "not even close to the truth."  TR 346.  Hickey further stated that he never turned down going to see Dr. Essay and that he never

declined medication. TR 347, 348. Further, Hickey testified that he had to stop seeing the doctor and taking his medications because he didn't have the money to do so after he lost his Medicaid. TR 340, 347.

The ALJ questioned Hickey about a report from Ms. Reuter, a friend of Hickey's, that said Hickey ran his own salvage yard. Hickey told the ALJ that he started it and then "when April left, it belonged to someone else." TR 349. Hickey testified that this occurred about three years prior to the hearing. TR 349. The friend's report claimed that Hickey "gets up, makes coffee, works in his salvage yard, takes parts off autos, and putting sheets of tin up. . . ." TR 349. Hickey responded that she was an old girlfriend, that she was trying to cause trouble, and that she's "kind of a strange person." TR 349. Hickey also testified that he wears his back brace most of the time and that it helps if he is riding long distance in a car, for example, when he drives to Des Moines, Iowa. TR 350, 351.

Examination of the Vocational Expert

The vocational expert, Steven Kuhn, assessed Hickey's former work as unskilled and performed at the medium physical demand level. TR 352. The ALJ presented Kuhn with two hypothetical situations. The first proposed whether someone with the "same age, education, and past work history both to as exertional as well as skill level" could "lift up to 50 pounds on occasion, 25 pounds on a frequent basis" and "in an eight hour day, stand for six hours or sit for six hours and complete an eight hour work day without having normal breaks." TR 352. Kuhn testified that the hypothetical would allow for medium work, which falls under a laborer of stores. TR 352. The ALJ then proposed a hypothetical "at the light level at 20 and 10 and six and six and unlimited." TR 353. The ALJ further asked, "Then he could do none of his past relevant work. Would that be accurate?" TR 353. Kuhn

confirmed that was correct. TR 353. Kuhn finally stated that if he were to treat Hickey's testimony as credible, "there would not be work available . . . given his physical abilities in the national or local economy." TR 353.

<u>     ALJ Opinion</u>

The ALJ found that Hickey's "medically determinable impairments could reasonably be expected to produce the type of symptoms . . . described by [Hickey]." TR 27. The ALJ then determined whether Hickey's condition precluded all types of substantial and gainful work activity. TR 27. In reviewing this issue, the ALJ determined that Hickey's testimony was not credible. The ALJ stated that Hickey was not compliant with prescribed treatment and actually declined treatment. TR 27. The ALJ further stated that "because it appears reasonable to expect that proper compliance with prescribed medical treatment would have a positive effect on the Claimant's impairments and symptomatology, and he has not demonstrated good cause for noncompliance, the Claimant's allegations with respect to the extent of his symptoms and limitations are not credible." TR 28. The ALJ also questioned Hickey's credibility relating to his sleeping habits, his lack of doctor visits over the prior year, as well as his over-the-counter aspirin and hot bath treatments. The ALJ reviewed Hickey's statements regarding his functional capabilities, including Hickey's long car trips and his other activities, which included cooking, cleaning, going fishing one to two times per week, going to the store two times per week, driving 50 miles at a time, going hunting, and visiting neighbors and friends. TR 28. The ALJ further recognized Ruth Reuter's supplemental information form regarding Hickey's involvement with a salvage yard. TR 28.

The ALJ found that in spite of Hickey's medically determinable impairments, Hickey's residual functional capacity was as follows: "He is able to lift up to 50 pounds on occasion and 25 pounds on a frequent basis; and in an 8 hour day, he could stand for 6 hours or sit for 6 hours and complete an 8 hour work day having normal breaks." TR 29. The ALJ further found that Hickey's past relevant work as a store laborer (which was at the "medium" exertional level) did not require demands beyond those set forth in the ALJ's residual functional capacity assessment. TR 29. The ALJ further determined that at the "medium" classification, 3,000 store laborer positions exist in the state of Nebraska and 400,000 positions exist in the national economy. TR 29. Therefore, the ALJ found that Hickey was not disabled. TR 29-30.

## STANDARD OF REVIEW

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (D)(1)(A); 20 C.F.R. § 404.1505. A claimant is considered to be disabled when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantially gainful work which exists in [significant numbers in] the national economy. . . ." 42 U.S.C. § 432 (D)(2)(A).

The ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines

> any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. *See* 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531,

533 (8th Cir. 1984). If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. *See Braswell*, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. *See id*. at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

When reviewing the decision not to award disability benefits, the district court does not act as a fact finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (*citing Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision either "because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citations omitted).

"The opinion of a treating specialist controls if it is well-supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence." *Kelley v. Callahan*, 133 F. 3d 583, 589 (8th Cir. 1998). "In reviewing applications for social security benefits, ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained in the record." *Prosch v. Apfel*, 201 F.3d 1010, 1010 (8th Cir. 2000). "A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical and diagnostic data." *Davis v. Shalala,* 31 F.3d 753, 756 (8th Cir. 1994).

In reviewing an application for Social Security disability benefits, the ALJ may credit other medical evaluations over that of the treating physician when such other "assessments 'are supported by better or more thorough medical evidence.'" *Prosch*, 201 F.3d at 1012 (citation omitted).   However, it is also important to note that "the opinion of a consultative physician who examines the claimant once or not at all does not generally constitute the substantial evidence." *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir. 1999), quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).  This is especially true when the consultative physician is the only examining doctor to contradict the treating physician. *See Jenkins*, 196 F.3d 922.  Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion."  20 C.F.R. § 404.1527(d)(2).

"Treating source medical opinions are still entitled to deference and must be weighed using all of the factors in C.F.R. § 404.1527. *Prosch*, 201 F.3d at 1016.  The five

14

factors that must be considered when determining if a treating physician's opinion should be granted controlling weight are: 1) the length of the treatment relationship; 2) nature and extent of treatment relationship; 3) quality of evidence in support of opinion; 4) consistency of the opinion with the record as a whole; and 5) whether treating physician is also a specialist.  20 C.F.R. § 404.1527(d).  "Treating physicians' opinions are not medical opinions that should be credited when they simply state that a social security disability claimant cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the commissioner of Social Security." *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004).

Hickey contends that the ALJ failed to give appropriate weight to his treating physicians, Dr. Farris and Dr. Essay.  Hickey argues that the ALJ must give controlling weight, or in the alternative substantial weight, to the testimony of treating physicians.  See SSR 96-2p (if  treating source medical opinion is consistent with medically acceptable technique and testing and is not inconsistent with other evidence, it receives controlling weight).  Further, argues Hickey, the ALJ failed to clearly articulate why he discredited the medical opinions of Dr. Farris and Dr. Essay as required under SSR 96-2p.

The Secretary argues that the findings of the ALJ considers and supports the medical opinions of Dr. Farris and Dr. Essay.  The Secretary contends that Hickey's allegations of severity regarding his pain and limitations are not consistent with the medical evidence offered by Dr. Farris and Dr. Essay, nor are they consistent with Hickey's own testimony as to his daily activities.  Dr. Miller stated that Hickey could probably do some "light work."  TR 235.  Dr. Miller further stated that Hickey would "not be able to work until he gets over this as he does heavy work requiring lifting heavy bags of dog food and so

15

forth." TR 241. Dr. Farris stated that Hickey was "trainable and could work at a more sedentary job and should avoid heavy lifting." TR 284. After reviewing the record, the court agrees with the ALJ. The records are replete with notes by Dr. Farris and Dr. Essay that Hickey is doing well after his surgery and when taking his medication. Further, the ALJ acknowledged that Hickey had limitations on his exertional level, which is fairly consistent with the opinions espoused by Dr. Farris and Dr. Essay. The court concludes that the ALJ complied with SSR 96-2p and 20 C.F.R. § 404.1527 in evaluating the testimony of the treating physician.

The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of relevant limitations. *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining RFC, an ALJ first must evaluate the claimant's credibility. In this case, the ALJ found Hickey's testimony not credible. The ALJ is required to consider evidence of third parties when assessing the claimant's condition. In this case, the ALJ relied, in part, on Ms. Reuter's statements in evaluating Mr. Hickey's condition and credibility.

At this stage, the underlying issue is the severity of the pain. *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'" *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected

inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

The ALJ is not required to discuss methodically each *Polaski* consideration, so long as the ALJ acknowledges and examines those considerations before discounting the subjective complaints (*Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996)), and makes "express credibility findings," and "explain[s] the record inconsistencies that support those findings." *Dolph v. Barnhart,* 308 F.3d 876, 879 (8th Cir. 2002). In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; the duration, frequency and intensity of pain; the dosage and effectiveness of medication; the precipitating and aggravating factors; and functional restrictions. See *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* § 416.929. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. See *Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history). Finally, the credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall v. Massanari,* 274 F.3d at 1218 (8th Cir. 2001).

In this case, the ALJ followed the appropriate analysis required by *Polaski* and § 416.920. The ALJ summarized Hickey's allegations of pain and exhaustively described his daily activities according to the testimony and documentary evidence. TR 20-30. The ALJ found that Hickey's testimony was not credible. TR 28-29, 32. The ALJ specifically considered, in addition to Hickey's testimony, documentary evidence including reports of treating and consultative physicians and the testimony of a VE. TR 20-26, 29-32.

Hickey's own testimony shows that he cooks simple meals, cleans his home, goes fishing one to two days a week, goes to the store two times a week, drives up to 50 miles at a time, goes hunting, and visiting neighbors and friends. Such activities generally do not support a finding of total disability. *Barnett v. Barnhart*, 362 F.3d 1020, 1023 (8th Cir. 2004). The ALJ is permitted to analyze inconsistencies in order to make a credibility determination. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).

Hickey argues that the ALJ erred in failing to consider the Field Report of Lisa Kohout. The first Field Report of September 9, 2002, was prior to Hickey's surgery and was, therefore, less relevant than the second Field Report of May 27, 2003. The May 27, 2003, report contains one statement that Hickey "walked w/ a limp, took him a while to get up out of the chair. Clothes were very dirty and smelled unclean." TR 130. The same report indicated that Hickey had no difficulty sitting. TR 130. While these observations support Hickey's testimony that he walks with a limp, they contradict his testimony that his pain is such that he bathes two to three times a day and that he has a problem sitting. Further, Kohout's comments regarding Hickey's limp are similar to those from plaintiff's treating sources (Tr. 220, 277, 284, 285). While the ALJ did not discuss Kohout's observations in his opinion, the court finds this to be harmless.

In this case, the ALJ's finding that Hickey possessed the RFC to perform his past relevant work as a store laborer and that Hickey was not disabled pursuant to 20 C.F.R. 404.1520(f) and 20 C.F.R. 416.920(f) is supported by substantial evidence in the record as a whole.

IT IS HEREBY ORDERED:

1. The decision of the Commissioner is affirmed;

2.  The appeal is denied; and

3.  Judgment is entered in favor of the defendant, Commissioner of Social Security, and against the plaintiff, Clarence Hickey.

DATED this 22nd day of August, 2008.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Court Judge